## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROBERT MELANCON**                                    **CIVIL ACTION**

**VERSUS**                                             **NO.  07-5877**

**KELLY WARD, WARDEN**                                 **SECTION "B"(2)**


## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and the petition **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.     FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Robert Melancon, is incarcerated in the David Wade Correctional

Center, in Homer, Louisiana.[2]   On September 14, 1995, Melancon was indicted in

Terrebonne Parish for the aggravated rape of a male under the age of 12 years old.[3]   The

Louisiana First Circuit Court of Appeal summarized the facts of the case as follows:

> In 1985, the defendant became the pastor at Annunziata Church, a Catholic
> Parish in Terrebonne Parish.  A few months later, the defendant talked with a
> parishioner about her younger son, K.P., becoming an altar server for the church.
> The family's older son was already serving as an altar boy when the defendant
> arrived at the church.  K.P., overweight for his age, was shy and did not have a lot
> of friends.  When K.P. began serving as an altar boy, his service included Mass on
> Sundays, weddings, baptisms, and funerals.  After most of the services, the defendant
> would bring K.P. home.  During the years that K.P. served as an altar boy, the
> defendant would occasionally take him out to eat and buy him gifts, such as cassette
> tapes and clothes.
> K.P. testified that his abuse began casually, by the defendant inviting him
> upstairs to his bedroom in the church rectory.  He watched television with the
> defendant in the priest's bedroom with the door closed.  At first, no touching
> occurred.  Then, the defendant began rubbing K.P.'s stomach.  He progressed to
> kissing K.P.'s face and chest and fondling his genitalia.  At first, the defendant
> touched K.P. on the outside of his clothing.
> The first acts occurred in the summer, about one year after K.P. met the
> priest.  K.P. was about nine and one-half years old when the defendant began having
> anal intercourse with him.  The defendant continued having intercourse with K.P.,
> averaging one or two times per month until the priest was transferred to a different
> church.  The acts usually occurred after 5:00 p.m.
> K.P., who was nineteen years old at the time of trial, admitted that he
> revealed he was homosexual after his eighteenth birthday.  He denied that his
> "coming out" had anything to do with his allegations against the defendant.  Rather,
> K.P. stated that he waited until his eighteenth birthday to reveal his sexual

---

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 13, Indictment, 9/14/95.  Melancon was also charged in Terrebonne Parish
Criminal Case No. 269196 with four counts of lewd and lascivious acts upon two other males under the
age of 17.  St. Rec. Vol. 9 of 13, Amended Bill of Indictment, No. 269196, 1/2/96.

orientation because "high school people are very, very scared of things that are different." K.P. also denied that his allegations were motivated by his civil lawsuit, which was settled shortly before the criminal trial for about $800,000.

On cross-examination, K.P. admitted that the majority of the rapes occurred after he had assisted at weddings or funerals. He did not recall any specific acts occurring on Sundays in connection with his service at baptisms. K.P. further testified that he never served at weddings or funerals during school hours and never left the rectory on his own and walked home. He could clearly recall only two incidents in which he had been raped; one occurred when the defendant and K.P. returned to the rectory from a funeral. K.P. testified that the first act of anal intercourse occurred in the summer of 1986. Although he did not clearly remember all the incidents, he was certain that he had been raped while he was in the sixth grade.

At first, K.P. stated that he never saw anyone in the rectory on the occasions that the rapes occurred; then he admitted that he saw Virginia Chatagnier, the housekeeper, on many occasions in the rectory. At those times he would usually greet the housekeeper. During her testimony, Ms. Chatagnier testified that occasionally, after K.P. and his brother served at morning mass, she would see them with the defendant, who indicated that he was taking the boys to breakfast and then on to their school. For about the year and a half before the defendant was moved from Annunziata Church, she was working in the rectory between 5:00 p.m. and 7:00 p.m. to prepare dinner.

Between the years of 1985 and 1991, K.P. had rectal bleeding. K.P.'s mother took him to the pediatrician, who examined K.P. and found a tear in the rectum. The doctor assumed the tear was caused by constipation and prescribed stool softeners and mineral oil, which would stop the bleeding in a few days. However, according to the mother, every few weeks the bleeding would return. When the defendant left the church parish in 1991, K.P.'s rectal bleeding did not return.

In May of 1992, K.P. told his cousin, Deacon Jeff Heipl, that he had been molested by the defendant. K.P. stated that the acts had stopped, but did not reveal the extent of the abuse. K.P. did not want Deacon Heipl to inform the victim's parents.

In April of 1995, K.P. disclosed to a friend that he had been sexually abused by the defendant in the past. This friend encouraged K.P. to tell the high school guidance counselor. When K.P. revealed the abuse, school officials reported the information to law enforcement authorities. K.P., who was having suicidal thoughts, was then admitted to a psychiatric hospital for about a week. After K.P. returned home, his parents were contacted by an attorney for the Catholic Diocese who wanted to talk to K.P. Following this unsolicited contact, K.P.'s parents filed a civil lawsuit against the defendant and the Catholic Church for the victim's sexual abuse.

R.F. testified that he was eleven years old when he met the defendant, who officiated at a Mass for his deceased father. At the time, the priest encouraged R.F.'s mother to allow her son, on overweight child, to become an altar boy. After R.F.

became an altar boy, he was sexually abused by the defendant.  The abuse occurred in the rectory and began with massaging and fondling by the priest.  R.F. stated he was thirteen years old when the acts led to anal intercourse.  During his testimony, R.F. also identified greeting cards sent to him by the defendant which referred to "Willie."  R.F. testified that the defendant used this name to refer to R.F.'s penis. R.F. further admitted that he settled a civil lawsuit against the Catholic Church and the defendant for $30,000.

Dr. Scott Benton, the director of the Child Abuse Program at Children's Hospital in New Orleans, testified that the Terrebonne Parish District Attorney's Office requested that he examine K.P.  In conjunction with the physical examination in July of 1995, K.P. related that when he was between the ages of eight and fourteen, the defendant sexually molested him.  The medical history reported by K.P. indicated that the acts included fondling and anal intercourse.  The victim also told the doctor that the priest had posters of semi-nude women in his bedroom.  Dr. Benton did not report any abnormal physical findings, but explained that this was not unusual, because the tissue around the anus is designed to stretch and heal without scarring.

The defense counsel denied the acts ever occurred.  In an attempt to show that the allegations were false, the defendant presented testimony of witnesses who lived or worked in the rectory.  Several witnesses testified that they never saw K.P. in the rectory.  These witnesses included Father Leopold Skorogod, who lived in the rectory and was regimented in his daily routine.  He always watched television in a room on the first floor of the rectory in the evenings after 5:00 p.m. until about 10:00 p.m.  Father Leopold testified that he never saw K.P. in the rectory.  While he stated that he had an unobstructed view of the rear door from his chair while watching television in the meeting room, he admitted that his view of the stairway leading to the second floor was partially blocked.  However, because of the creaking stairs, he would know if someone was using the stairs.

Harriet Pelligrin, the secretary and bookkeeper who worked on the first floor of the rectory, never recalled seeing K.P. in the rectory.  However, she admitted that when she was in the her office, she did not know who came in or out of the rectory. Many of the witnesses asserted that the stairs leading to the second floor creaked and that the walls were not well insulated.  However, in order to enter the defendant's bedroom, a person did not have to pass the bedroom of others.  Several witnesses, who had access and an opportunity to go into the defendant's room testified that they never saw posters in the priest's bedroom depicting beer advertisements or semi-nude women.

The defendant also presented the testimony of Terry Campbell, who stated that while on a youth trip, K.P. confided in her that he had been touched in an inappropriate manner by Father Morrison, another priest; he did not accuse the defendant of any inappropriate touching.  K.P. also told her that during the trip he did not want to be assigned a room with a priest because of the past sexual touching and was reassigned a room with Deacon Heipl.

(footnote omitted) <u>State v. Melancon</u>, 739 So.2d 1017 (La. App. 1st Cir. 1999) (Table); State Record Volume 9 of 13, Louisiana First Circuit Court of Appeal Opinion, 98-KA-1146, pp. 2-6, May 14, 1999.

Melancon was tried before a jury from June 10 through 14, and June 17 and 18, 1996, and he was found guilty as charged.[4]  The state trial court sentenced him on August 12, 1996, to serve a mandatory life sentence without benefit of parole, probation or suspension of sentence.[5]  Melancon's counsel gave oral notice of intent to appeal but did not file a written notice of appeal until 10 months later, on June 20, 1997.[6]

On direct appeal, Melancon's counsel raised five grounds for relief:[7]  (1) The trial court erred in denying the motion to change venue. (2) The trial court erred in accepting challenges for cause to excuse two jurors from the panel. (3) The trial court erred in admitting the hearsay testimony of a doctor as to statements of the victim. (4) The trial

_____

[4]St. Rec. Vol. 6 of 13, Verdict Form (2 pages), 6/18/96; St. Rec. Vol. 8 of 13, Trial Minutes, 6/10/96; Trial Minutes, 6/11/96; Trial Minutes, 6/12/96; Trial Minutes, 6/13/96; Trial Minutes, 6/14/96; Trial Minutes, 6/17/96; Trial Minutes, 6/18/96.

[5]St. Rec. Vol. 8 of 13, Sentencing Minutes, 8/12/96; St. Rec. Vol. 6 of 8, Sentencing Transcript, 8/12/96.

[6]St. Rec. Vol. 8 of 13, Sentencing Minutes, 8/12/96; St. Rec. Vol. 6 of 8, Sentencing Transcript, p. 8, 8/12/96; St. Rec. Vol. 8 of 13, Motion and Order Fixing Return Date for Filing Appeal, 6/20/07; Trial Court Order, 6/10/97.

[7]St. Rec. Vol. 9 of 13, 1st Cir. Opinion, 98-KA-1146, 5/14/99.

court erred in denying three motions for mistrial based upon the introduction of "other crimes" evidence. (5) Prosecutorial misconduct deprived him of a fair trial.

On May 14, 1999, the Louisiana First Circuit Court of Appeal affirmed the conviction and sentence, finding no merit to any of Melancon's claims.[8]  Melancon's counsel filed a writ application with the Louisiana Supreme Court on June 11, 1999, seeking review of the same five claims.[9]  The court denied the application without reasons on December 10, 1999.[10]

Melancon's conviction became final 90 days later, March 9, 2000, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).[11]

On December 7, 2000, Melancon, through other retained counsel, filed an application for post-conviction relief in the state trial court raising the following grounds

---

[8]State v. Melancon, 739 So.2d at 1017; St. Rec. Vol. 9 of 13, 1st Cir. Opinion, 98-KA-1146, 5/14/99.

[9]St. Rec. Vol. 9 of 13, La. S.Ct. Letter, 99-K-1708, 6/11/99; Copy of La. S. Ct. Writ Application, (signed by counsel 6/10/99), 6/13/00.

[10]State v. Melancon, 751 So.2d 243 (La. 1999); St. Rec. Vol. 9 of 13, La. S. Ct. Order, 99-K-1708, 12/10/99.

[11]This includes consideration that February of 2000 had 29 calendar days. This apparently accounts for the error in the State's calculation of the 90-day period.

for relief:[12] (1) Trial and appellate counsel provided ineffective assistance in the following ways: (a) trial counsel erred in making statements to the press after a gag order was issued; (b) trial counsel erred in seeking to include evidence of the monetary settlements to the victim and a witness; (c) trial counsel failed adequately to cross-examine the witness; (d) appellate counsel failed to challenge the trial court's ruling on the Prieur motion to admit evidence of the sexual abuse to the witness; (e) appellate counsel failed to challenge the sufficiency of the evidence. (2) He was denied due process and a fair trial because of the prosecutor's animus towards Melancon and the Catholic church and due to adverse publicity surrounding the case.

After delayed efforts by Melancon's counsel to obtain certain transcripts, the state trial court held two evidentiary hearings on Melancon's application.[13]  On May 1, 2006, the state trial court denied the application noting that "written reasons are currently being prepared."[14]  The court thereafter issued written reasons finding that, based on the evidentiary hearing testimony and argument, trial counsel acted within the boundaries

---

[12]St. Rec. Vol. 10 of 13, Application for Post-Conviction Relief, 12/7/00; Memorandum in Support of Application for Post-Conviction Relief, 12/7/00; Supplemental Memorandum in Support of Application for Post-Conviction Relief, dated 7/7/03; St. Rec. Vol. 9 of 13, Application for Post-Conviction Relief (Corrected), 1/8/03; St. Rec. Vol. 13 of 13, Post-Hearing Memorandum in Support of Application for Post-Conviction Relief, 3/1/05.

[13]St. Rec. Vol. 11 of 13, Transcript of Post-Conviction Hearing, 8/18/04; St. Rec. Vol. 12 of 13, Transcript of Post-Conviction Hearing, 10/20/04.

[14]St. Rec. Vol. 13 of 13, Trial Court Order, 5/1/06.

of sound trial strategy and that appellate counsel raised only those claims on appeal that he felt had merit.[15]  The court also resolved that the Louisiana First Circuit had already determined that the evidence was sufficient to support the verdict, that there was no prosecutorial misconduct, and that the adverse publicity did not render the trial unfair.

Melancon's counsel filed a timely writ application with the Louisiana First Circuit and the court denied the application without reasons on November 29, 2006.[16] Melancon's counsel also filed a timely writ application in the Louisiana Supreme Court, which was denied without reasons on June 22, 2006.[17]

## II.   FEDERAL HABEAS PETITION

On September 24, 2007, Melancon, through retained counsel, filed a petition for federal habeas corpus relief in this court raising two grounds for relief:[18] (1) Trial and appellate counsel provided ineffective assistance in the following ways: (a) trial counsel erred in making statements to the press after a gag order was issued; (b) trial counsel

---

[15]St. Rec. Vol. 13 of 13, Reasons for Denial of Motion for Post-Conviction Relief, 7/27/06; Notice of Ruling, 8/1/06.

[16]The record does not contain a copy of this writ application. The filing date of July 31, 2006, was confirmed through counsel for the State and the clerk of the Louisiana First Circuit Court of Appeal. St. Rec. Vol. 13 of 13, 1st Cir. Order, 2006-KW-1520, 11/29/06.

[17]The record does not contain a copy of this writ application. The filing date was confirmed with the clerk of the Louisiana Supreme Court.  St. Rec. Vol. 13 of 13, La. S. Ct. Letter, 2006-KP-3003, 12/22/06; State v. Melancon, 959 So.2d 502 (La. 2007); St. Rec. Vol. 13 of 13, La. S. Ct. Order, 2006-KP-3003, 6/22/07.

[18]Rec. Doc. No. 1.

erred in seeking to include evidence of the monetary settlements to the victim and the witness; (c) trial counsel failed adequately to cross-examine the witness; (d) appellate counsel failed to challenge the trial court's ruling on the <u>Prieur</u> motion to admit evidence of the sexual abuse to the witness; (e) appellate counsel failed to challenge the sufficiency of the evidence.  (2) He was denied due process and a fair trial because of the prosecutor's animus towards Melancon and the Catholic church and due to adverse publicity surrounding the case.

The State filed an answer and memorandum in opposition to Melancon's petition conceding exhaustion but arguing that Melancon's petition was not timely filed.[19] Alternatively, the State argued that the claims are without merit and Melancon is not entitled to relief.

III.    <u>GENERAL STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[20] and applies to habeas petitions filed after that date.  <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198

---

[19]Rec. Doc. No. 5.

[20]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

(5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)). The AEDPA therefore applies to Melancon's petition, which was filed by counsel with this Court on September 24, 2007.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; <u>i.e.</u>, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. <u>Nobles v. Johnson</u>, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State has alleged as its primary defense that Melancon's federal petition is not timely filed. I find that this defense must be rejected. In brief, the AEDPA requires a petitioner to bring his Section 2254 petition within one year of the date his conviction became final.[21] <u>Duncan v. Walker</u>, 533 U.S. 167, 179-80 (2001). The AEDPA itself

---

[21]The statute of limitations provision of the AEDPA provides for other triggers which do not apply here:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;

C.    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

provides for interruption of the one-year limitations period, in stating that "[t]he time during which a <u>properly filed application for State post-conviction or other collateral review</u> with respect to the pertinent judgment or claim is pending <u>shall not be counted</u> toward any period of limitation under this subsection."   28 U.S.C. § 2244(d)(2) (emphasis added).

In this case, as discussed above, Melancon's conviction became final on March 9, 2000.  He allowed 272 days to elapse from that date before his counsel filed an application for post-conviction relief in the state trial court on December 7, 2000.  I have determined that this, and Melancon's subsequent state court pleadings, remained pending and continued to toll the AEDPA statute of limitations period through June 22, 2007. This is the date on which his last writ application to the Louisiana Supreme Court was denied.   At that time, Melancon had 93 days remaining in the AEDPA statute of limitations period, or until Sunday, September 23, 2007, to file his federal petition.  His counsel filed the petition on the following business day, Monday, September 24, 2007. <u>See</u> Fed. R. Civ. P. 6 (Sundays excluded as the last day in time computation).  His petition is timely and the State's timeliness defense must be rejected.

----

D.     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.  28 U.S.C. § 2244(d).

IV.    STANDARDS OF REVIEW

Amended 28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)),  aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210

F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93; Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

V.      INEFFECTIVE ASSISTANCE OF COUNSEL

Melancon alleges that he received ineffective assistance from both his trial and appellate counsel.  He claims that his trial counsel erred in making statements to the press after a gag order was issued, erred in seeking to include evidence of the monetary settlements to the victims, and failed adequately to cross-examine the witness.  He further alleges that his appellate counsel failed to challenge the trial court's ruling on the Prieur motion to admit evidence of the sexual abuse to the witness and failed to challenge the sufficiency of the evidence on appeal.

These claims were first raised in Melancon's application for post-conviction relief. The last reasoned decision was that of the state trial court.[22]  The court resolved that the violation of the gag order was a matter resolved pretrial and had no effect on the defense or on the performance of his counsel during trial.  The court also held that, based on the post-conviction testimony, trial counsel made the decision to address the financial settlements and to attack the witness's testimony as part of the strategy of the defense to undermine the credibility of the alleged victims.  The court also noted that the admissibility of the "other crimes" evidence had been resolved before trial and the defense was unsuccessful on writ applications seeking to overturn the trial court's ruling

---

[22]St. Rec. Vol. 13 of 13, Reasons for Denial of Motion for Post-Conviction Relief, 7/27/06.

14

in that regard.  In sum, the court resolved that defense counsel's actions fell within the ambit of permissible and sound trial strategy.

With regard to the claims against appellate counsel, the court resolved, based on appellate counsel's testimony, that he raised only those claims that he felt had merit after review of the record and discussions with trial counsel.  Counsel believed that the case hinged on a credibility call and that a challenge to the sufficiency of the evidence would not have been successful under the standards of Jackson v. Virginia, 443 U.S. 307 (1979).

The Louisiana First Circuit and the Louisiana Supreme Court both denied Melancon's subsequent writ applications without reasons.  When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

The issue of ineffective assistance of counsel is a mixed question of law and fact. Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994).  Thus, the question before this court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

The standard for judging the performance of counsel was established by the United States Supreme Court in  Strickland v. Washington, 466 U.S. 668 (1984), which the state

trial court cited and applied.  In Strickland, the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and resulting prejudice. Strickland, 466 U.S. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  Kimler, 167 F.3d at 893.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  It is not enough, however, under Strickland 'that the errors had some conceivable effect on the outcome of the proceeding.'"  Motley, 18 F.3d at 1226 (quoting Strickland, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance."  Moore v. Johnson, 194 F.3d 586, 591 (5th Cir.

16

1999) (citing Strickland, 466 U.S. at 689-90).  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.  Strickland, 466 U.S. at 689; Neal, 286 F.3d at 236-37; Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001).  "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  Bell, 535 U.S. at 697 (citing Strickland, 466 U.S. at 689).

This court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690.  Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly

17

proven otherwise.  <u>Strickland</u>, 466 U.S. at 689; <u>Moore</u>, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient.  <u>Id</u>.

A.    <u>Trial Counsel's Actions</u>

      Melancon claims that his trial counsel erred in making statements to the press after a gag order was issued, erred in seeking to include evidence of the monetary settlements to the victims, and failed adequately to cross-examine the witness, by introducing his civil settlement and a sexual relationship with Melancon between ages 17 and 24.  Melancon relies on the fact that one of his attorneys, George Simno, made comments to the press before trial regarding the trial judge's perceived bias.  The record demonstrates that the comments led to a bar complaint against Simno by the trial judge and were resolved with a written apology.  Melancon argues that this scenario affected the relationship between the defense and the trial court.  Melancon also suggests that Simno's post-conviction testimony that the case was an emotional one and his disclosure that, as a child, he was inappropriately touched by a priest, had an impact on Simno's performance and crucial trial decisions.  He argues that the cumulative affect of Simno's pretrial arrogance and confrontational behavior created a negative public sentiment and undermined the defense.

      Melancon offers no particular reference in the record which would demonstrate that counsel's remarks negatively impacted the defense or the outcome of the trial.  The

record shows that whatever negative public sentiment, if any, existed had been aired before Simno's comments and was in fact brought to the court's attention by Simno and co-counsel through the motions to change venue.[23]

In addition, Melancon has failed to demonstrate how Simno's comments in any way affected the trial judge's decisions in a manner to effect the outcome of trial.  There is nothing in the record to demonstrate that the trial court retaliated or reacted to Simno's comments by unfavorably ruling on the Prieur motion or the motion to change venue. In fact, the trial judge specifically testified at the motion to recuse that Simno's statements and the complaint to the Louisiana State Bar Association Disciplinary Committee would have no effect on him if Simno continued to practice before him.[24] When ruling on this issue post-conviction, the state trial court also specifically held that defense counsel's pretrial actions "did not undermine the process. . ."[25]  The trial judge was in the best position to determine whether counsel's actions impacted the process and his own rulings.  In fact, a neutral judge made the same conclusions at the hearing on the motion to recuse the trial judge.

---

[23]St. Rec. Vol. 2 of 13, Motion for Change of Venue, 11/28/95; St. Rec. Vol. 4 of 13, Motion for Change of Venue, 5/1/96; see also, St. Rec. Vol. 5 of 13, Motion for Gag Order, 5/14/06.

[24]St. Rec. Vol. 5 of 13, Transcript of Motion to Recuse (continued), 4/30/96.

[25]St. Rec. Vol. 13 of 13, Reasons for Denial of Motion for Post-Conviction Relief, p.2, 7/27/06.

Melancon has not demonstrated that counsel's pretrial comments to the press after the gag order in any way affected the trial, the trial judge or the ability of the defense to function before the court.  If anything, the record reflects that Simno and co-counsel were zealous and effective in presenting Melancon's case to the court and to the jury. Melancon has not shown that Simno was deficient or that his pretrial comments prejudiced the outcome of the case.

Melancon also suggests that counsel erred in failing to exclude, and instead actively presenting, evidence of the monetary settlements paid to the victim and a witness by the Catholic church, not Melancon.  John DiGiulio, trial co-counsel for Melancon, testified at the post-conviction hearing that the defenses against the victim's allegations were that he had a financial interest and was not telling the truth, in light of the $800,000 civil settlement he made with the Diocese of Houma/Thibodaux just prior to trial.[26]  He also testified that, because the state courts allowed the witness's testimony to be introduced as evidence of pattern, the strategy regarding the allegations and expected testimony of the witness was that over the age of 17, he had a consensual relationship with Melancon.[27]

---

[26]St. Rec. Vol. 11 of 13, Transcript of Post-Conviction Hearing, pp. 22, 27, 8/18/04.

[27]Id., pp. 22, 29.

20

As part of that defense, counsel elicited testimony from the witness on cross-examination that the relationship lasted beyond age 17, until age 24, and that he had received a $30,000 settlement in connection with his prior civil suit regarding the underage abuse.  DiGiuglio could not recall what the strategic reasons was for presenting this information regarding the witness and Melancon.

George Simno, as co-counsel, testified at the post-conviction hearing that the defense strategy was simply to refute the State's evidence against Melancon.[28]  He stated that one of the theories of the defense was that the victim was interested in money and another was that there was no evidence to corroborate anything he said.[29]  With regard to the $800,000 settlement made on the eve of the criminal trial, he stated that he did not believe it to be harmful to the defense and in fact thought it relevant to the defense:[30]

> I don't think it would be harmful.  I think it gives him 800,000 reasons to lie and disregard the truth having participated in his civil deposition.
> . . .
> Well, obviously, if it came in and the case was settled on the eve of trial, it would have been part of our defense.  Whether it was strategy or not, I am not going to quibble with your term.  If you want to call it a strategy, that's fine.  It was 800,000 reasons to cast a bad light on [the victim] to show that he had a reason to be – – disregard the truth.

---

[28]St. Rec. Vol. 12 of 13, Transcript of Post-Conviction Hearing, p. 21-22, 10/20/04.

[29]Id., p. 23.

[30]Id., pp. 22-23.

21

With regard to the settlement by the witness, Simno also could not recall why this would have been part of the defense theory.[31]  He did recall, however, that the defense knew it would be facing the testimony of a witness who had also received a civil settlement.[32]  He also stated that the defense believed that the witness, like the victim, had "30,000 reasons to lie."[33]

Simno also testified that, contrary to Melancon's post-conviction argument, his past experience of inappropriate contact by a priest had absolutely no emotional effect on him or on his presentation of Melancon's defense.[34]  He also denied that this incident led him to favor or sympathize with the victim on cross-examination.[35]

Having reviewed this testimony, there is more than sufficient information to support the state trial court's finding that the decision to address the civil settlements and the adult relationship between Melancon and the witness was part of the defense strategy or theory.  Counsel apparently believed that the jury would be impressed in a credibility context by the fact that the circumstantial allegations of both the victim and the witness resulted in substantial monetary settlements.  The fact that this defense was not

---

[31] Id., p. 25.

[32] Id., pp. 24-26, 39.

[33] Id., pp. 27, 29, 31.

[34] Id., pp. 53-54, 59.

[35] Id., p. 54.

successful does not stand alone to establish deficient performance. <u>Martinez v. Dretke</u>, 99 Fed. Appx. 538, 543 (5th Cir. 2004). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Strickland</u>, 466 U.S. at 689 (citations omitted).

In this case, Melancon has not shown that counsel's attempt to establish the falsehood of the allegations against him by introducing to the jury the civil settlements or evidence of a witness's adult consensual relationship with Melancon was either unreasonable under the circumstances or deficient performance. Melancon's allegations against his trial counsel point to no constitutional deficiency in, or prejudice resulting from, their actions, as required by <u>Strickland</u>. <u>Miller</u>, 200 F.3d at 282 (quoting <u>Barnard v. Collins</u>, 958 F.2d 634, 642 (5th Cir. 1992)). Melancon has failed to establish that he is entitled to relief on this claim under <u>Strickland</u> or that any denial of relief on this claim by the state courts was contrary to, or an unreasonable application of, Supreme Court law.

B.    <u>Appellate Counsel's Actions</u>

Melancon alleges that his appellate counsel failed to challenge the trial court's ruling on the <u>Prieur</u> motion to admit evidence of the sexual abuse of the witness and

failed to challenge the sufficiency of the evidence at trial on appeal.[36]   The trial court

ruled that evidence of abuse under age 17 would be admissible.

In State v. Prieur, 277 So.2d 126 (La. 1973), the Louisiana Supreme Court held

that evidence of other acts of misconduct is generally not admissible to show the

defendant's bad character, but that such evidence is allowed to prove "motive,

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or

accident, or when it relates to conduct that constitutes an integral part of the act or

transaction that is part of the subject of the present proceeding."  See also La. Code Evid.

art. 404(B)(1); State v. Jackson, 625 So.2d 146, 148 (La. 1993).

Although the record does not contain the motion transcript, the parties concede in

their respective written submissions that, prior to Melancon's trial, the state trial court

ruled in a Prieur hearing, that a pattern of sexual acts with juvenile boys had been

established and evidence of sexual intercourse with a witness between the ages of 13 and

17 would be admissible.[37]  This ruling was unsuccessfully challenged by Melancon in the

Louisiana First Circuit.  Melancon's trial counsel also objected at trial to the testimony

of the witness and unsuccessfully moved three times for a mistrial as a result.

---

[36]St. Rec. Vol. 4 of 13, Motion to Admit Evidence of Prieur/Other Acts/Crimes, 4/24/96.

[37]See St. Rec. Vol. 9 of 13, 1st Cir. Opinion, 98-KA-1146, p. 18, 5/14/99.

Melancon now suggests that appellate counsel should have challenged the trial court's <u>Prieur</u> ruling on direct appeal.  Appellate counsel, Ed Greenlee, testified at the post-conviction hearing that he had no notes as to why he did not raise a direct challenge to the <u>Prieur</u> ruling.[38]  He also testified that he generally would not raise an issue if he determined that it was without merit.  He further testified that he felt that the appeal issue raised was adequate to bring before the court the question regarding the propriety of the testimony of the witness in light of the <u>Prieur</u> ruling.[39]

While the <u>Prieur</u> ruling was not directly challenged on appeal, appellate counsel did in fact argue that the trial court erred in denying the defense's motions for mistrial arising from the "other crimes" testimony.[40]  When addressing this claim on direct appeal, the Louisiana First Circuit noted that the defense moved for a mistrial after the witness described three sexual acts or incidents by Melancon which were not related to or similar to the sex acts against the victim.  In addressing whether a mistrial should have been granted, the appellate court reviewed the specific testimony to determine whether, under Louisiana law, the testimony was admissible under La. Code Ev. art. 404(B)(1) to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

---

[38]St. Rec. Vol. 11 of 13, Transcript of Post-Conviction Hearing, pp. 63-64, 8/18/04.

[39]<u>Id</u>., at p. 72-73, 80.

[40]<u>Id</u>., p. 17 (assignment of error No. 4)

mistake or accident.  The court further noted that Louisiana law would also require under
Prieur that the State prove, among other things, that the defendant committed the other
acts and the court must provide a charge to the jury that the "other crimes" evidence
serves this limited purpose.

The court then commented that the testimony of the witness in general tended to
show Melancon's lustful disposition and a pattern of committing sex acts with minor
boys.  The court also resolved that the probative value of the testimony regarding oral sex
and the viewing of homosexual videos, which were "less serious" crimes than the
charged offense of anal rape, outweighed its prejudicial effect.[41]

On post-conviction review, the state trial court referenced the appellate court's
findings.  After considering appellate counsel's testimony and the appellate court's ruling,
the court determined that a direct challenge to the Prieur ruling would have been
meritless and no prejudice resulted from counsel's actions.

The Louisiana courts have already determined that the testimony was admissible
under state law to show Melancon's lustful disposition and a pattern of molesting
overweight, shy, young altar boys.  It is understandable that Melancon would have
preferred to keep this evidence from the jury, but its admission was a matter of state law.

[41]Id., p. 22.

The issue before this court is whether the failure to challenge the trial court's decision was deficient performance and prejudicial to the outcome of the case. Melancon has made no such showing.

As determined by the state trial court, appellate counsel's decision not directly to challenge the <u>Prieur</u> ruling was not unreasonable and appears to have been made after thorough review of the record, potentially meritful claims, and discussions with trial counsel. Most significant to a showing that there was no prejudice is the fact that, no matter how the evidentiary challenge was presented, the appellate court in fact reviewed the testimony of the witness and found that it was appropriate under La. Code Ev. Art 404(b). The <u>Strickland</u> decision requires that Melancon prove both deficient performance and prejudice. He has not done so.

Melancon also claims that his appellate counsel should have challenged on appeal the sufficiency of the evidence and, having failed to do so, he has been denied the right to make this challenge. The state trial court determined that appellate counsel decided not to raise such a claim on appeal in light of the state of the case law in applying the <u>Jackson v. Virginia</u> standard. The state trial court noted that counsel testified at the post-conviction hearing that the case hinged upon a credibility determination for the jury and that a sufficiency of the evidence claim would have been meritless. Thus, his decision was a strategic choice, and Melancon has failed to prove deficient performance.

In addition, the trial court also reviewed the evidence and determined that there was sufficient evidence to support the verdict.  Counsel's decision was based on the well-established standards of Jackson v. Virginia, 443 U.S. 307 (1979), which requires the court to determine whether, after identifying the elements of the offense as defined by state substantive law and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt.  Jackson, 443 U.S. at 319; Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2000); Gilley v. Collins, 968 F.2d 465, 467 (5th Cir. 1992); Guzman v. Lensing, 934 F.2d 80, 82 (5th Cir. 1991).  The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.  Guzman, 934 F.2d at 82 (citing Tyler v. Phelps, 643 F.2d 1095, 1102 (5th Cir. 1981)).

The record before this court does not contain a full trial transcript.  It does contain, however, a transcript of the testimony of the victim, which contained the most damaging testimony.[42]  Furthermore, the facts summarized and relied upon by both the State and Melancon track those factual findings made on direct appeal by the Louisiana First Circuit.

Under Louisiana law, to prove aggravated rape of a child under 12 years old, the State must prove: (1) anal or vaginal penetration deemed to be without consent of the

---

[42]St. Rec. Vol 7 of 13, Transcript of Testimony Given By the Victim, 6/13/96.

28

victim because of (2) the victim's age at the time of the rape.  State v. Williams, 950 So.2d 126 (La. App. 2d Cir. 2007); State v. Wright, 690 So.2d 850, 856 (La. App. 3d Cir. 1997).  Moreover, "[a]ny penetration, however slight, . . . is sufficient."  State v. Self, 719 So.2d 100, 101 (La. App. 3d Cir. 1998).  This is a general intent crime and the victim's testimony alone is sufficient to establish the fact of penetration.  State v. Maise, 805 So.2d 1141, 1151 (La. 2002); State v. Mitchell, 453 So.2d 1260 (La. App. 3d Cir. 1984).

The findings of fact outlined by the Louisiana First Circuit on direct appeal, as corroborated by the trial transcript, show that the victim became an altar boy under Melancon's tutelage shortly after his eighth birthday.  Within the first year, Melancon on occasions rubbed his stomach, fondled his genitals, and repeatedly, anally raped him. Melancon gave the boy gifts and bought him meals.  The rapes and gift-giving occurred twice a month or more and continued for years.  During the period of continued sexual abuse, the victim suffered repeated incidents of rectal bleeding and tearing, which healed with medical treatment, only to recur after each rape.  The rectal bleeding ceased when Melancon was transferred away and the abuse stopped.

The jury also heard the witness's recounting of his molestation by Melancon between the ages of 13 and 17.  The jury also heard the testimony that the same witness had consensually continued that relationship after age 17 to age 24.  The defense offered

testimony to show that no one ever saw the victim in the rectory and that no other witness knew of any inappropriate activity or sexually explicit materials in Melancon's room.

The evidence in the record is more than sufficient to establish that the victim was 8 or 9 years old when the anal rapes began.  It is also sufficient to support a finding that Melancon raped the victim on numerous occasions.

For these reasons, the trial court's finding that appellate counsel was not deficient, nor his actions prejudicial, was not contrary to Strickland.  The decision not to raise the issue was the strategic resolve of his review of the record and discussions with trial counsel.  In addition, the evidence adduced at trial was sufficient under Jackson to support the jury's verdict; therefore, no prejudice arose from counsel's failure to raise the issue on direct appeal.

The denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Melancon is not entitled to relief on this claim.

VI.    DENIAL OF DUE PROCESS AND A FAIR TRIAL

Melancon alleges that he was denied due process and a fair trial because of the prosecutor's animus towards Melancon and the Catholic church and due to adverse publicity surrounding the case.  Melancon argues that the prosecutor, interested in his own political career, began a probe of the Catholic church in an effort to find other, unrelated child molestation incidents.  He contends that this investigation, along with

30

continual, derogatory stories about the case against Melancon, were continually reported in the press.

Melancon also points to testimony at the post-conviction hearing which tended to show, by his estimation, that one-third of the potential jurors knew about the case and the majority had been victims, or knew victims, of child abuse.  Melancon suggests that the district attorney's animus, coupled with the publicity, demonstrate that the denial of the motion to change venue violated due process and insured that Melancon could not get a fair trial in Terrebonne Parish.

The state trial court offered the last reasoned opinion on this issue on post-conviction review.  The court determined that the issue of prosecutorial misconduct had actually been addressed by the Louisiana First Circuit on pages 23 and 24 of its opinion, where it determined that no such misconduct was evident from the record.[43]  The court resolved that the references at trial to the Catholic diocese, churches and priests were made for legitimate purposes in the presentation of evidence.

The court also resolved that the Louisiana First Circuit on direct appeal had considered the negative publicity in connection with the motion to change venue.  The appellate court found, as discussed previously in this report, that there was no prejudice or error resulting from the denial of the motion to change venue and that Melancon had

---

[43]St. Rec. Vol. 13 of 13, Reasons for Denial of Motion For Post-Conviction Relief, p. 6, 7/27/06;
St. Rec. Vol. 9 of 13, 1st Cir. Opinion, 98-KA-1146, p. 23-24, 5/14/99.

not established that his trial was rendered unfair as a result of being held in Terrebonne Parish.

For Melancon to establish that his trial was unfair in violation of due process, he would have to show a "failure to observe that fundamental fairness essential to the very concept of justice.  In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." Lisenba v. People of the State of California, 314 U.S. 219, 236 (1941); Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.)  Furthermore, claims of prosecutorial misconduct like those raised by Melancon must be evaluated under plain error analysis to determine if the alleged violations "seriously affected the fairness, integrity, or public reputation of judicial proceeding and resulted in a miscarriage of justice."  United States v. Goff, 847 F.2d 149, 162 (5th Cir. 1988), cert. denied, 488 U.S. 932 (1988) (citing United States v. Livingston, 816 F.2d 184, 195 (5th Cir. 1987)).  Melancon, in this case, has not established a violation of due process or that his trial was unfair.

Melancon references in his brief certain quotes by the prosecutor in which he mentioned the Catholic church when discussing Melancon's defense.   Ironically,

Melancon refers to portions of the transcript where the prosecutor is accusing Melancon of using or hiding behind the cloak of the Catholic church to impute his innocence.[44] Nevertheless, Melancon has not pointed to any portion of the record where the prosecution could be accused of tainting the jury or the trial by confusing the church as a whole with the specific acts committed by Melancon.  It is clear from the record before this court that the evidence tended to establish that Melancon, not the Catholic church, was guilty of the aggravated rape for which he was convicted.

Melancon's negative publicity argument is nothing more than a restated challenge to the denial of his motion to change venue, a claim not raised here.  As conceded by Melancon, the negative publicity prevailed prior to trial and prior to voir dire.  The record reflects that the trial court placed a gag order on the parties, the jury pool was pre-screened by questionnaire at the request of the defense, and voir dire was conducted in discrete panels so as not to taint the entire pool.  These actions support a finding that the state trial court attempted to protect the integrity of the voir dire and the trial.

Melancon also has not established that any member of the actual jury was predisposed to a guilty verdict, tainted by the press or publicity, or said or did anything to suggest prejudice or animus against Melancon.  Melancon simply argues that, because so many panel members expressed a predisposition, a fair trial could not be had.

---

[44]Rec. Doc. No. 1, Petition, Memorandum in Support, p. 32.

However, the references to persons excused because of their predisposition is a red herring in determining whether the actual jury was prejudiced in a way to deny Melancon a fair trial.  He has made no such showing to this court or to the state courts.

Melancon has failed to establish a denial of due process or that he was denied a fair trial.  The state court's' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court law.  Melancon is not entitled to relief on this claim.

### RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Robert Melancon for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within ten (10) days of entry of this order. (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to

34

object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this _____6th_____ day of March, 2008.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE